We'll hear argument next in number 2011-1277 in Ray Robinson. Mr. Flowers, when you're ready. Yes, Your Honor. Thank you. Kevin Flowers for the appellant, Your Honor. With all due respect to our good friends in the Patent Office, the Patent Office got this wrong from the very beginning. The Patent Office failed to establish a prima facie case of obviousness here. The Patent Office took a single passage, two sentences, out of the Ragu reference, which is at A396. And I'll read it because I think we, in the briefing, the Patent Office in particular seemed to get away from the literal language that was in Ragu. Ragu said fatigue was noted in 42% of patients. This subsided with a decreased dosage and with reminder to take the medication with food and liquid. So that's on A401 in the record. The PTO relies on that short passage to say that Ragu provided some generalized teaching that perfenadone should be administered to IPF patients with food and that will decrease pretty much any and all adverse effects in those patients. The PTO ignores, as we pointed out in our brief, the PTO ignores the very next paragraph and passage in Ragu where Ragu said the drug was well tolerated with minimal side effects, which promptly subsided after discontinuation of the drug or decrease in dosage. That's again on A401. Now we know there's a long line of case law from this court, certainly including the Bausch and Long case, which says that the PTO and courts are not allowed to pick and choose that evidence out of the record that they believe supports their case and ignore the other evidence in the record that goes against their case. Now we would put forth that these passages in Ragu itself, the primary reference being relied upon by the PTO below in here, contain that evidence that goes against obviousness and it's this reference here and these passages in Ragu which show that the Patent Office didn't have substantial evidence to support a promofacea case of obviousness against our claims. Just as a reminder, our claim 21, for example, which is at A24, I won't read the whole thing, but it says giving perfenadone, 2400 mg per day, to a idiopathic pulmonary fibrosis patient, which is not a reduced dose, giving it with food to decrease dizziness and it goes on. Now Ragu itself, and I give credit to the Patent Office and the Solicitor's Office, I think they recognize, certainly in their brief, that Ragu itself did not disclose that 2400 mg per day dose, which is required by our claim. But what they went round and round about with the applicant below and on appeal to the board and in the briefing here, they didn't recognize, they seemed to ignore the fact that Ragu itself said if you want to get adverse effects from perfenadone to subside, you give a decreased dose. In fact, they seem to keep sidestepping the fact that Ragu itself said if you want to, for example, get fatigue, an adverse effect of perfenadone to decrease, you decrease the dosage. And then the rest of that sentence is, and with the reminder to take the medication with food or liquid. So I think, Your Honor, the best thing that can be said for Ragu is that it said A, B, and C. It said decrease the dose, said that twice, and in fact emphasized it in particular as the way to get side effects to subside. So it's A, B, and C, decreased dose, no doubt about that, and with liquid and food, A, B, and C. But if all three of those things help, how is it teaching away from the use of food to decrease side effects? Because it's teaching, I think it's consistent just on A401 in Ragu. It's teaching that in order to get side effects to decrease, the one thing we can be clear about is you have to decrease the dose. And we also went round and round about this below in the patent office. The patent office seemed to want to sidestep or ignore the subsequent prior art documents, which never mentioned food. So we're talking about Azuma, Nagai, Moises, etc. Those other prior art references which followed Ragu, and including Azuma, in which Ragu himself was a co-author, they never said anything about food. Now surely Ragu himself was obviously aware of his prior reference and the studies that they had done at the University of Washington. And if Ragu himself believed that food was even part of a way to get side effects such as fatigue or gastric upset to subside, surely they would have mentioned that in their subsequent paper talking about giving profenadone to IPF patients and in which they talked about side effects. To follow up on Dr. Malloy's question, what do you make of a statement, this subsided with decreased dosage and with reminder to take medication with food and liquid? It seems to me that that's saying A and B have this consequence, this favorable consequence, which suggests that B contributes to that favorable consequence. At least that seems to me the most natural reading. Your Honor, I think when you look at the two statements in Ragu itself, you combine those two statements, and of course as the law requires, look at the full scope of what the prior art reference teaches, and in fact the other prior art as well, you're left with the conclusion. I don't see how you can't be left with the conclusion that Ragu is saying A, B, and C. Ragu is saying decrease the dose twice, and then it's saying and B and C, and with food and liquid. Now there's some indication there, obviously, not to use a pun, but obviously there's some indication there by Ragu that they thought that there was a potential at least. It's a little unclear, I think. It's somewhat a vague statement, but I think it's a little unclear. But you could say, okay, they thought that food might play some role, but I don't think we can definitively say that from the Ragu reference. I don't think you have to be a physician in particular to read those sentences in Ragu and come away with the feeling. I think the strong impression, in fact, that Ragu was saying A, B, and C. And our claim, just to remind, our claim 21, for example, says where Ragu was saying A, decrease the dose, our claim says not a reduced dose, not a decreased dose. So we say not A. Ragu says B, liquid. We don't have any requirement one way or the other on liquid. Ragu says C, food. We say give with food. But we also say 2,400 milligrams, D, if you will. And we also say E, to decrease dizziness. Neither of which, D and E, are mentioned anywhere in Ragu. So we've got, at best, a prior art reference Ragu, which says A, B, and C. And we say not A, nothing about B, and C, D, and E. That cannot be the basis for obviousness. That's not a prima facie case for obviousness. That's not evidence that a reasonable mind would find adequate to support an obviousness case. Simply because the word food is mentioned in combination with a clear teaching in Ragu about how to avoid side effects doesn't mean that it's obvious that one should simply give food with profenadone at a specific dose to decrease dizziness. Now, because Ragu didn't disclose that 2,400 milligram per day dose that we require in our claims, the PTO compounded the problem and went ahead and combined the Ragu reference with the Walker reference at A405. Now, the PTO focused on this Walker reference despite the fact that the Walker reference, and I think everybody would agree, is directed towards giving profenadone to multiple sclerosis patients. As I said, all patients have been classified as secondary progressive multiple sclerosis for at least two years. That's at A407. The Patent Office, instead of looking at that and saying, well, is there any reason why one of ordinary skill at the time our application was filed, would have looked to a reference which talks about a dose for multiple sclerosis patients. Instead, they focused on the simple fact that Walker disclosed giving 2,400 milligrams a day to those multiple sclerosis patients, which is at A407, and some nausea was encountered, especially if the drug was taken without food. That's at A412. Now, we'd all agree that in order to establish the prima facie case, combining Walker with Ragu, the PTO had the obligation and the duty to show that there was some motivation to combine those two references. To overuse the phrase, we danced around with this, and the PTO below kept sort of sidestepping the issue on this. It's why would one of ordinary skill have thought that a reference which talks about giving this drug profenadone to multiple sclerosis patients, who obviously are sick, but are not certainly sick in the way that idiopathic or IPF patients are. IPF is a terminal disease, average survival rate four years, and you can look in both Walker itself and in Ragu and see that in multiple sclerosis patients, they really didn't have anything in the way of side effects, or at least the only thing they had seemed to be a little nausea. Whereas, when you give this drug to IPF patients, these are really sick patients. They've got a wicked bad disease. Most of them did not, well, a large proportion of them didn't even survive the study in Ragu. How would you take a reference talking about profenadone for multiple sclerosis patients who showed little in the way of side effects and think that that dosage was going to be appropriate, both in terms of safety and effectiveness, for these really sick IPF patients, where you know they have many side effects and serious side effects? I see that I'm down into my time for rebuttal, so if necessary, I would stop there. I'm sorry, there's a question. I'm having a hard time understanding the arguments about the side effects and the connection to the particular disease. Are you saying that the side effects of this medication are different depending on what disease it's treating? That certainly seems to be the case. And again, you don't have to be a physician, I think, to understand that when you're dealing with multiple sclerosis patients who obviously have a progressive disease that they're sick patients, but it's categorically different when you're talking about IPF patients. These are terminally ill patients, and from those prior references, Walker and Ragu themselves, you can see that there is a different spectrum, a different universe, and a much more serious universe of side effects in the IPF patients because of the nature of their illness and perhaps because of the interaction of profenadone with whatever symptoms they already have. Was there a declaration submitted to the PTO saying that the side effects are different? No, there wasn't, but again, I think it's a situation where you don't have to be a physician, for example, to look at them. You can look at the evidence, the data that's put forth pretty plainly in Walker and Ragu, where Ragu talks about IPF patients, and in fact, the other references, Azuma, Moises, Nagai, talk about that spectrum of side effects which IPF patients suffer or have when they are administered profenadone, and then you look at Walker, the multiple sclerosis paper, and it basically says, well, they had some nausea, and some of them had some nausea if they didn't take it with food. So I don't think we needed testimony below in the form of a declaration from one of Ordinary Skills saying, if I read these papers, I see this because it's plain on their face. All right, well, why don't we reserve the rest of your time for rebuttal and hear from the solicitor. Mr. Johnson. May it please the Court. There are basically two steps involved in the claim at issue here. One step involves an administering step and the other an advising step. With respect to the administering step, it requires 2,400 milligrams per day of profenadone be given to an IPF patient. Well, that was known. Ragu teaches that you should prescribe 40 milligrams per kilogram per day to the IPF patient, and the record shows that there's a segment of the IPF community that weighs 60 kilograms. So the board found that for a 60-kilogram IPF patient that prescribed doses should be 2,400 milligrams, and that coincides with the administering step of Robinson's administering. But there's nothing that says that IPF is limited to women who aren't very happy. No, and that's completely correct, Your Honor, but the examiner made two findings, one with respect to what you just mentioned regarding American women, and then the other with respect to what was provided to it from Robinson, which was evidence which shows that 60 kilograms was a known weight for a certain segment of the IPF community. The examiner relied upon that evidence provided to it from Robinson and came up with the calculation that 2,400 milligrams per day would be the dosage for that 60-kilogram individual. So that's with respect to the administering step. Ragu shows that the dosage was known. That moves us to the informing step. The informing step requires patients to be informed of certain beneficial aspects to taking the profetadone with food. However, under CAL, this court has said that informing in and of itself does not render patentable an otherwise obvious method. And in CAL, Claim 21 dealt with an informing step and an administering step. And for the informing step, the patients needed to be informed that the bioavailability of oxymorphine increased with respect to renal failure in comparison to individuals that were healthy. And for the administering step, they needed to be given an effective therapeutic amount of oxymorphine. The court stated there that in order for the informing step to confer any amount of patentability, that the informing step needed to be functionally related to the administering step. And it determined that there was no functional relationship there because the informing step did not transform the process for taking the dosage. It determined that the claims did not require any change in dosage in response to the informing step. And therefore, the court concluded that because the administering step was already known and there was a failure to establish a functional relationship between the informing step and the administering step, that the claim was properly rejected. There were a similar set of facts in King Pharmaceuticals where there was, again, an informing step and an administering step. And there, the court determined that there was no functional relationship between the informing step and the administering step because simply explaining to the patient the benefits of taking the drug did not transform the process of taking the drug. Those two cases are analogous to the facts here. Here, Robinson's arguing that because they've come up with certain benefits, that they should receive a patent. However, under this court's case law in Cow and King Pharmaceuticals, they're wrong because they have not established anywhere in the brief to the board or even in their blue brief to this court that there's a functional relationship between the informing step and the administering step. Because they've failed to present that argument to this court, they have not established that there's a functional relationship. So as in Cow and King Pharmaceuticals, this court should find that their informing step does not confer any patentability at all. Now, they've also argued that because of the benefits that were found with respect to dizziness, that they ought to receive a patent for that reason. However, dizziness and some of the other pharmacokinetic properties which they've uncovered are merely inherent properties of taking the drug with food. But under this court's case law, simply discovering a new benefit for an old property does not render that process patentable. And in Schreiber and in Cow, this court has established that inherent properties do not render any patentability for an old process. And what Robinson has basically done is recognize an inherent property that had always been in existence, however, it was previously unknown. But that does not mean that they have actually invented something that was new. Now, they argue that Azuma and Nagai established some form of teaching away. However, those two publications do not even mention food. So there's nothing in those two studies that would have discouraged one of ordinary skill in the art from following Ragu and Walker. But their point is that it doesn't mention food. In other words, if all the prior art continuously addresses something like symptoms in ways other than food, then there is case law that says in those circumstances you could find teaching away. Sure, and I get their point, Your Honor. But one of ordinary skill in the art, when considering the adverse effects of profenadone, they would have looked to Ragu and Walker simply because Ragu and Walker dealt with the same problem. So they would have looked to Ragu and Walker and found the problem. The solution would have been to combine food with the drug. Although Azuma and Nagai discussed profenadone, because they did not also discuss food, one of ordinary skill in the art would have looked to Ragu and Walker over those two studies because there was nothing in those studies that would have discouraged the person of ordinary skill in the art from following the instructions that were there in Ragu and Walker. With respect to the language that's on page 401, that's the language in Ragu where Ragu clearly says that with respect to fatigue, fatigue subsided with a decreased dosage and a reminder to take the medication with food and liquid. As this court recognized, that's an A plus B sort of analysis. And they would have this court read out the B and simply go with A. But this reference is good for all that it teaches, which is both A and B. If there are no further questions. Thank you. Mr. Flowers, rebuttal. Thank you, Your Honor. I think there are four points I'll try to address quickly here. On the first point Mr. Johnson raised, on the 60-kilogram segment of the IPF population, we put into the record below that an average weight for a Japanese patient is 60 kilograms. The examiner and the board relied on that. But as Judge O'Malley, as you noted, obviously IPF patients are not limited to 60-kilogram women. And, in fact, our subsequent evidence that we put in and relied upon below and here from our own clinical studies show that, in fact, for U.S. patients such as the patients, of course, that were being dealt with and medicated in the Ragu study who are in Washington State, that, in fact, the patients who have IPF are significantly heavier than that. So there's actually no evidence in the record that anyone looking at Ragu, who is treating IPF patients in the United States with profenadone, would have had anyone who was 60 kilograms. Just no evidence at all. On the second point, on the informing step, we never get to that. I know it's been briefed in the briefs, a lot of things have been briefed in the briefs, but we don't need that informing step because there's no obviousness of our administration step. We don't get to the informing step and we don't need to rely upon the informing step for patentability here. Our case is distinguishable on that basis from the King and the Cow cases, in particular because in King and Cow, the Metaxilone and the oxymorphone cases, the court found that the administration step was anticipated. So the parties there had to rely upon their informing step and did rely on that informing step in order to try to establish patentability. We don't need to do that here. The patent office hasn't established that they have substantial evidence to support a prima facie case of obviousness here. Certainly there's no evidence that our, and even the patent office doesn't argue, that our administration step was anticipated. On the third point, inherent benefits, we did in fact discover, our scientists are the ones who in fact did discover and invent a new process. We're not talking about an old process that was in the art for many years, like in some of the other cases. We invented, because we went and did the research and did the studies, we invented a new process and found that it was very useful and it had unexpected benefits. In that we found, our scientists found through scientific research, that in fact you could give a full therapeutic dose to an IPF patient and still sidestep or avoid these adverse effects. Whereas the prior art taught, if you look at those prior art references that we've talked about, they taught, I think Judge Malley, as you pointed out, they taught decreasing the dose. Now, we can't say that doing the research and finding this, finding a new process, a new method for treating these patients, cannot rebut a case of obviousness put forth by the patent office, because those results were inherent. As we said in our briefing, all scientific results in that respect, if you're going to look at it that way, all scientific results would be inherent, because they're there with a process, it's just that you don't know it until you actually invent the process. Well, that's not adherency and that doesn't render them obvious. And as this Court has found in previous cases, there's a long line of cases that says, you're not going to rely upon that which was unknown in this situation, particularly this type of situation, to support an obviousness case. On the last point Mr. Johnson raised about the Zuma and the Guy, no, they didn't mention food, as Judge O'Malley pointed out. They consistently taught to avoid side effects, administering profenadone to IPF patients, that you decrease the dose. Now the solicitor has said that a Zuma and a Guy deal with a different problem, because they didn't mention food, but in fact here they dealt with exactly the same problem. They were giving profenadone to IPF patients and they found side effects. And what did they say? They said where side effects were found, we found that decreasing the dose results in those side effects subsiding. I think I'll end there. Thank you. Thank you, Eric. Mr. Flowers, thank you. And Mr. Johnson, thank you.